UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAMUEL SAUNDERS,

                                    Petitioner,                    10 Civ. 5896 (CS)(LMS)

            - *against* -                                          <u>REPORT AND</u>
                                                                   <u>RECOMMENDATION</u>

THOMAS L. LAVALLEY, Superintendent,


                                    Respondent.


**TO: THE HONORABLE CATHY SEIBEL, U.S.D.J.**[1]

        Petitioner Samuel Saunders, proceeding <u>pro se</u>, has filed the instant petition for a writ of

habeas corpus pursuant to 28 U.S.C. § 2254, challenging the constitutionality of his state court

conviction on four counts of murder in the second degree (N.Y. Penal Law §§ 125.25(1) & (3)),

one count of kidnapping in the first degree (N.Y. Penal Law § 135.25(3)), one count of robbery

in the first degree (N.Y. Penal Law § 160.15(2)), one count of burglary in the first degree (N.Y.

Penal Law § 140.30(1)), and one count of criminal possession of a weapon in the second degree

(N.Y. Penal Law § 265.03(3)).  Am. Pet. 1.  After a jury trial, Petitioner was sentenced to an

indeterminate period of twenty-five years to life for murder in the second degree; an

indeterminate period of twenty-five years to life for kidnapping in the first degree; a determinate

period of twenty-five years with five years' post-release supervision for robbery in the first

degree; and a determinate period of fifteen years with five years' post-release supervision for

criminal possession of a weapon in the second degree.  The sentences were to run concurrently.

---

[1] Your Honor referred this application to me for preparation of a Report and Recommendation on
September 13, 2010.  Order of Reference, Docket Entry (herein, "D.E.") 3.

Copy mailed to pro se party of record.

S: 34-34.[2]

Petitioner filed a direct appeal to the New York State Appellate Division, Second Department. Resp't's Ex. E. On appeal, Petitioner made three arguments: (1) Petitioner was denied a fair trial by admission of evidence from an alleged prior robbery; (2) Petitioner was denied a fair trial by admission of custodial statements in violation of the Petitioner's Miranda rights;[3] (3) the jury's verdict was against the weight of the evidence. Resp't's Ex. E. On March 23, 2010, the Supreme Court, Appellate Division, Second Department unanimously affirmed the conviction. People v. Saunders, 71 A.D.3d 1058 (N.Y. App. Div. 2010); Resp't's Ex. H. Thereafter, Petitioner filed an application for leave to appeal to the New York Court of Appeals, raising the same claims that he had made on direct appeal. Resp't's Ex. I. On June 15, 2010, the Court of Appeals denied Petitioner's application. People v. Saunders, 15 N.Y.3d 757 (2010); Resp't's Exhibit L.

Petitioner filed his Petition for habeas corpus on August 4, 2010. Pet., D.E. 1. He then filed an Amended Petition on April 1, 2011. Am. Pet., D.E. 14.

Herein, Petitioner raises the following grounds for habeas relief:

(1) The admission of evidence of a prior robbery violated Petitioner's Fourteenth Amendment right to a fair trial;

(2) Admission of Petitioner's pre-trial, custodial statements violated Petitioner's Miranda rights;

(3) The jury's verdict was against the weight of the evidence. Am. Pet. 2.

For the following reasons, I conclude, and respectfully recommend that Your Honor

---

[2] Herein, "S" refers to the March 26, 2008, sentencing transcript.

[3] Miranda v. Arizona, 384 U.S. 436, 471-79 (1966).

2

should conclude, that this Petition should be denied in its entirety.

# I. BACKGROUND[4]

## A.    The Crime

At approximately 10:55 A.M., on the morning of January 3, 2007, Doctor Leandro Lozada called an 800 number for Bank of America Investment Services. T2: 274, 324-26, 872-73.[5] He requested a transfer of $400,000 from his brokerage account to his checking account. T2: 327. Bank of America employee Stephen Griffin told Lozada that only $50,174.49 was available for immediate transfer. PE: 158. Griffin heard a second person (later identified as the Petitioner) ask, "What do you have available today?" T2: 331, 788. Lozada repeated the question to Griffin, who replied that $50,174.49 was available for immediate transfer. PE: 158. Lozada asked Griffin to transfer that amount, and Griffin completed the transaction as requested. Id. The transfer brought the total in Lozada's checking account to a few hundred dollars over $57,000. T2: 309.

Later that day at approximately 1:45 P.M., Petitioner entered a Washington Mutual Bank in Bronx, New York. T2: 370-71. He deposited a check in the amount of $57,000, dated January 3, 2007, made payable to him from Lozada's Bank of America checking account. T2: 296-97, 371-75. Approximately an hour later Lozada's girlfriend, Doctor Carmen Ramos, found Lozada dead in his apartment on Brendan Hill Road in Yonkers. T2: 246-48. He had gunshot wounds in his face and head. T2: 712, 1146-48, 1150-51. Ramos testified that when she arrived

---

[4] Herein, "H" refers to the transcript for pretrial hearings from January 3, 2008 through January 10, 2008. "T1" refers to the transcript for jury trial from January 14, 2008 through January 17, 2008. "T2" refers to the transcript for jury trial from January 18, 2008 through February 4, 2008. "PE" refers to a People's exhibit at trial.

[5] The People introduced a recording and transcript of this call into evidence at trial. T2: 328-39. Herein, "Bank of America call recording" refers to the recording of this call.

at Lozada's apartment the front door to the house was unlocked, although in her experience

Lozada usually kept that door locked.  T2: 246-47.  A yellow chair with blood stains on its edge

and back had been moved from the dining room to the bedroom.  T2: 479-80, 995-96.

On the night of June 5, 2007, detectives, with the assistance of the crime scene unit,

found in the garbage shed of Petitioner's apartment complex, among other items: a blood-stained

towel with "Leandro" embroidered on it (T2: 407-08, 433-34, 464, 514); a black glove (T2: 464,

514); a pair of blood-stained sneakers owned by Petitioner (T2: 516-18, 522-53, 574-75, 587);

Lozada's blue laundry bag, which contained a blood-stained pillow, a second black glove, and

two swatches of cloth—one of which matched a piece of cloth found in Lozada's dresser (T2:

516-18); a bloodied piece of duct tape with a bullet hole (T2: 443-44, 538-42, 545-52); a blood-

stained T-shirt and pair of shorts belonging to Lozada (T2: 443-44, 538-40, 554-55, 990-92); and

three pillowcases from Lozada's bedroom, one of which had two pieces of duct tape attached to

it and another containing two pieces of duct tape (T2: 443-44, 538-40, 554-55, 557).  The towel

with "Leandro" embroidered on it and the first black glove were found loose in the garbage bin,

while the rest of the items were found in two black, plastic, garbage bags.  T2: 433-34, 444, 537-

41, 547-57.

The blood stains on the pair of sneakers matched Lozada's DNA, and the inside of the

sneakers contained DNA from which Petitioner and his family could not be excluded.  T2: 1000-

01, 1071-72.  Forensic analysis showed the following: the striation and other characteristics of

the two black, plastic, garbage bags matched those of the garbage bags in an opened Ultrasac

box found underneath Petitioner's sink (T2: 693, 704-05, 827, 830, 838, 855); the holes in the

pillowcase were bullet holes (T2: 951, 954, 957); the blood on the duct tape matched Lozada's

DNA (T2: 548; 1009-10); the blood stains on the yellow chair also matched Lozada's DNA (T2:

4

995-96); and Lozada was likely seated, with the duct tape and a pillowcase secured around his head, when he was shot in the head (T2: 479-80, 542, 954-58, 995-96).[6]

DNA testing showed that wall markings in Lozada's home matched the DNA of Petitioner's co-defendant, Juan Bernardez. T2: 1002, 1014-15. Telephone records revealed that Petitioner had called Bernardez's cell and home telephone numbers several times the night before and the morning of Lozada's murder. T2: 780, 859-62, 1078, 1095-97. Detectives recovered from Bernardez's home a box of .22-caliber cartridges of the same type and classification as bullet fragments retrieved from Lozada's head. T2: 622, 625, 629, 1134-36, 1138.

Petitioner told Detective George Piedade that the $57,000 check from Lozada was payment for a property on Lincoln Avenue in Yonkers that Petitioner was selling to Lozada for $200,000. T2: 749. However, no paperwork regarding the Lincoln Avenue property was found in Lozada's home. T2: 750. Petitioner did not own the Lincoln Avenue property. T2: 749. He could not explain what the term "flipping" the property meant, though he claimed he was "flipping" the Lincoln Avenue property to Lozada. T2: 749, 750. When asked why the check was for $57,000, Petitioner said Lozada had chosen the amount, but Petitioner did not know why Lozada had chosen that amount. T2: 767, 891-92. Lozada's investment advisor testified that, within thirty days prior to Lozada's murder, Lozada had transferred $50,000 from his bank account to his brokerage account, in order to earn a higher interest rate. The advisor also testified that Lozada expressed no intention of using the money any time soon. T2: 310-11. Petitioner also told Detective Piedade and Sergeant William Rinaldi that he had received the $57,000 check around Christmas, and that Lozada had chosen to postdate the check for tax

---

[6] Doctor Kunjala Ta Ashar also testified that the direction of the bullet wounds in Lozada's head was consistent with the finding that Lozada was seated when he was shot in the face and head. T2: 1151-52.

reasons, as well as to allow him to liquidate some assets before the check would be negotiated. T2: 749, 751, 892.

Petitioner had previously sold his home in Brendan Hill to Lozada in May of 2006, at a loss of $25,000, because Petitioner and his ex-wife, Edna Saunders, were getting divorced. T2: 226, 349-51, 564-67, 639-40. After that sale Petitioner had asked real estate salesperson Louis Castaldi to find a property for Petitioner to buy. T2: 350. Castaldi found a property for Petitioner, and Petitioner made a $47,000 down payment on the property. T2: 352-53. However, Petitioner lost the $47,000 deposit when he was unable to pay the remainder of the purchase price. T2: 352-53. In July of 2006, Castaldi told Petitioner that a property at 110 Lincoln Avenue in Yonkers, consisting of two lots, one of which was vacant, was for sale at $730,000. T2: 353, 363, 367. Petitioner told Castaldi that he wanted to buy the property, and Petitioner and Castaldi agreed that the vacant lot of the two lots would be listed for resale. T2: 363-64, 366. In October of 2006, Petitioner was required to make a down payment of $73,000 on the Lincoln Avenue property in order for the purchase to go forward. T2: 354-55. Petitioner paid $10,000, and for the next few months he failed to pay any additional money. T2: 354-55, 420, 421. During that time Petitioner reconciled with Edna Saunders, and he told her that they would move into the Lincoln Avenue home in the first week of January 2007. T2: 567, 576-77, 580. Castaldi pressed Petitioner for the rest of the down payment. T2: 355-56, 419-21, 423. The day after Lozada's murder, Petitioner showed Castaldi a receipt from the $57,000 deposit and told Castaldi the amount was for the remainder of Petitioner's deposit on the Lincoln Avenue property. T2: 356-58.

6

**B.**     **The Davis Robbery**[7]

At trial, the People introduced Stuart Davis's testimony about a prior robbery, allegedly

committed by Petitioner, as proof of identity. T2: 635-53. Davis was an attorney who had

represented Petitioner in the purchase and sale of the Brendan Hill home and in the sale of an

apartment on Minford Avenue in Bronx, New York. T2: 636-42. Davis testified that six months

prior to Lozada's murder, on June 29, 2006, at approximately 1:00 P.M., Petitioner and two other

men had entered Davis's office. T2: 641. One of the men had locked the front door and pointed

a pistol at Davis. T2: 641-42, 644, 646. Petitioner had then asked Davis how much money he

had in his escrow account. T2: 642-43. Davis had responded that he had $40,000. T2: 643.

Petitioner had told Davis to write a check to Petitioner for $40,000 and to call the bank and

confirm how much was available in the account. T2: 643-45. Davis had called the bank, and the

bank had confirmed there was approximately $47,000 available. T2: 645. Petitioner had then

told Davis they were going to hold Davis in the office for three days until the check cleared. T2:

647.

Petitioner had brought a chair from the reception area into Davis's office, and had told

Davis to sit in the chair. T2: 643-44. One of Petitioner's cohorts had secured Davis's arms with

duct tape to the chair's arms and stuffed a rag in Davis's mouth and placed tape across it. T2:

646-47. Petitioner had removed the tape from Davis's mouth after Davis had gestured for

Petitioner to remove the tape. T2: 648-49. Davis had told Petitioner that they should go to the

bank together to cash the check, and that the bank had previously cashed checks of larger

amounts for Davis. T2: 649. Petitioner and his cohorts had then released Davis from the duct

---

[7] At the time of the Petitioner's trial in this case, Petitioner had been indicted on charges of
robbery in the first and second degrees for the Davis robbery. Resp't's Mem. 5 n.4; T1: 316.

tape, Davis had then written a check for $45,000 to Petitioner, and they had all walked out of the office to the bank. T2: 650-51, 656. Petitioner had told Davis that the men would kill him if he did not get the money. T2: 652. Inside the bank Davis had cashed the check, and he had then given the money to Petitioner. T2: 652-54. They had walked outside and Petitioner had told Davis he would get the money back soon, but that if Davis went to the police Petitioner and his cohorts would kill him. T2: 653, 660. Davis had immediately returned to his office and called the police. T2: 653-54.

## C.     The Interrogations

Detective Piedade testified during a pretrial hearing that he first read Petitioner his Miranda rights when Detective Piedade, Detective Anthony Chiarella, and Sergeant Rinaldi arrested Petitioner for grand larceny on January 5, 2007, at Petitioner's address at 10 Pennyfield Avenue in Bronx, New York. H: 26-28. The detectives and sergeant had spoken with employees at Washington Mutual Bank about the $57,000 check Petitioner had deposited on January 3, 2007. H: 8-17. Detective Piedade testified that, after reading the Miranda warnings to Petitioner, Piedade asked Petitioner if he had any questions, and Petitioner answered no. H: 28. The detectives did not initiate any conversation with Petitioner on the ride to the Yonkers Police Station. H: 30. At the police station, Petitioner was placed in an interview room. H: 31. At around 8:30 P.M., Detectives Chiarella and Piedade entered the room and read Miranda rights to Petitioner again, asked Petitioner if he understood the warnings, and handed Petitioner the Miranda warnings card. H: 33. Detective Piedade asked Petitioner if he would speak to the detectives about a check that he had deposited on January 3, 2007. H: 33. Petitioner told the detectives at that point that he would talk to them about the check. H: 33, 138. Detective Piedade asked Petitioner to sign the Miranda warnings card if he understood what was on the

card. H: 33-34. Petitioner said he did not want to sign anything and pushed the card back toward the detective. H: 34. Detective Piedade then wrote "Refused" and the time on the card. H: 34-35. The trial court found that Petitioner had agreed to answer questions about the $57,000 check. H: 411. The interrogation lasted about an hour. Id.

Prior to this initial interrogation, Petitioner had asked to use the restroom, and he was allowed to do so. H: 31, 42. During the interrogation Detectives did not have their weapons with them in the interview room. H: 37. Petitioner was not restrained in any way. H: 37. Petitioner said that if he had had anything to do with Lozada's death he would not have deposited the check, knowing that Lozada's murder was "high profile" and in the news. H: 40. Detective Piedade told Petitioner that Petitioner could not have known that Lozada had been murdered when Petitioner deposited the check, because the check was deposited before Lozada's body was found. H: 40-41. Petitioner then said he did not want to talk anymore. Id. Petitioner remained unhandcuffed and the door was left ajar when Detectives Piedade and Chiarella left the room. H: 41-42.

Shortly thereafter, Detective James Konka again escorted Petitioner to the bathroom, upon Petitioner's request. H: 42-43. Petitioner told Detective Konka that he was a diabetic and had not taken his medication. H: 42-43, 179. Petitioner did not appear to be sick, confused, or in pain. H: 43. After Petitioner returned to the interview room, Sergeant Rinaldi conducted a second interview and asked Petitioner questions about the reason that Lozada had written the check in the amount of $57,000 and about Petitioner's claim about selling the property to Lozada. H: 232. Petitioner responded that Lozada had postdated the check to first liquidate some assets and that Petitioner was flipping the Lincoln Avenue property to Lozada. H: 233. At approximately 10:50 P.M., police officers took Petitioner to Saint Joseph's Hospital for the

hospital to assess whether Petitioner needed medication.  H: 42-43, 45, 163, 225.  No law

enforcement officers questioned Petitioner while he was taken to the hospital or while Petitioner

was at the hospital.  H: 43-45.  Petitioner stayed at the hospital overnight.  H: 45-46, 225.  No

officers questioned Petitioner on his way back to the police station the following morning.  H:

46.

Back in the interview room on the morning of January 6, 2007, at approximately 5:30

A.M., Detective Piedade and Sergeant Rinaldi conducted a third interview of Petitioner.  Id.  The

officers told Petitioner that they had located articles in the garbage shed outside Petitioner's

residence and asked Petitioner if he wished to speak with them about what was found.  Id.

Petitioner said yes.  Id.  Detective Piedade again read Petitioner his Miranda rights and Petitioner

said, "I know my rights."  H: 49.  Petitioner still refused to sign the Miranda warnings card.  H:

49.  However, Petitioner said he would speak with the detectives, and Petitioner asked the

detectives what they found in the garbage.  H: 50, 52.  Detective Piedade responded that a blood-

stained, green towel with "Leandro" on it was found.  H: 52.  Petitioner said he had never seen a

towel like that.  Id.  The detectives provided coffee and food for Petitioner.  H: 46-47, 52.  The

detectives spoke with Petitioner regarding the $57,000 check.  H: 52-53.  During the interview

Petitioner was not handcuffed.  H: 48, 176.  The detectives' weapons were not in view.  H: 49.

The detectives made no threats or promises to Petitioner.  H: 59.  No one else was in the room.

H: 61.  The interview ended at approximately 6:30 A.M., and Petitioner remained in the room.

H: 60-61.  Detective Piedade returned to the interview room at approximately 10:00 A.M. to ask

Petitioner more questions after a search of Petitioner's house was executed.  H: 54.  Detective

Piedade asked Petitioner whether he had black garbage bags in his home, and Petitioner said no.

H: 62.  Detective Piedade asked Petitioner whether the bloody sneakers found in the garbage

belonged to Petitioner, and Petitioner said no.  H: 62.  The interview lasted approximately fifteen

minutes.  H: 64, 178.  After the interview, Petitioner was taken to central booking.  H: 64.

## II.  DISCUSSION

### A.    Standard of Review

"Habeas review is an extraordinary remedy." Bousley v. United States, 523 U.S. 614, 621

(1998) (citing Reed v. Farley, 512 U.S. 339, 354 (1994)).  To be granted a writ of habeas corpus

from a federal district court, a petitioner must fully and carefully comply with the provisions of

the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  Under

the AEDPA, all state remedies must be exhausted before a federal court may consider a state

prisoner's petition for a writ of habeas corpus.  28 U.S.C. § 2254(b)(1)(A); see also Picard v.

Connor, 404 U.S. 270, 275 (1971).  In the interests of comity and expeditious federal review,

"'[s]tates should have the first opportunity to address and correct alleged violations of [a] state

prisoner's federal rights." See Coleman v. Thompson, 501 U.S. 722, 731 (1991); see also Daye v.

Att'y Gen. of New York, 696 F.2d 186, 190-91 (2d Cir. 1982).  The exhaustion requirement of the

federal habeas corpus statute is set forth in 28 U.S.C. § 2254(b), (c):

> (b)(1)  An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted unless it appears
> that--
>> (A) the applicant has exhausted the remedies available in the courts of the State;
>> or
>> (B)(I) there is an absence of available State corrective process; or
>>> (ii) circumstances exist that render such process ineffective to protect the
>>
>> rights of the applicant.
>
> . . .
>
> (c) An applicant shall not be deemed to have exhausted the remedies available in
> the courts of the State, within the meaning of this section, if he [or she] has the
> right under the law of the State to raise, by any available procedure, the question

presented.

28 U.S.C. § 2254(b), (c).

The Second Circuit has adopted a two-stage inquiry to determine whether the exhaustion doctrine has been satisfied.  See Klein v. Harris, 667 F.2d 274, 282 (2d Cir. 1981).  First, the petitioner must have "fairly presented" his or her federal constitutional claim to the appropriate state courts.  Picard, 404 U.S. at 275-76.  "A claim has been 'fairly presented' if the state courts are apprised of 'both the factual and the legal premises of the claim [the petitioner] asserts in federal court.'"  Jones v. Vacco, 126 F.3d 408, 413 (2d Cir. 1997) (quoting Daye, 696 F.2d at 191).  In other words, the claim must have been presented in a way that is "likely to alert the court to [its] federal nature."  Daye, 696 F.2d at 192.  The fair presentation requirement is satisfied if the state court brief contains phrases, such as "under the due process clause" or "under the Constitution," that point to the petitioner's reliance on the United States Constitution as his or her legal basis for relief.  Klein, 667 F.2d at 282 (citations omitted).  A claim may be considered "presented" even if the federal grounds were not explicitly asserted before the state courts if the petitioner, in asserting his or her claim before the state court, did one of the following: "(a) reli[ed] on pertinent federal cases employing constitutional analysis, (b) reli[ed] on state cases employing constitutional analysis in like fact situations, (c) assert[ed] . . . the claim in terms so particular as to call to mind a specific right protected by the Constitution, [or] (d) allege] . . . a pattern of facts that is well within the mainstream of constitutional litigation."  See Daye, 696 F.2d at 194.

Second, having fairly presented his or her federal constitutional claim to the appropriate state court and having been denied relief, the petitioner must appeal his or her conviction to the highest state court.  Klein, 667 F.2d at 282.  Where a petitioner fails to present his or her federal

constitutional claim to the highest state court, the claim cannot be considered exhausted. Id. (citing Williams v. Greco, 442 F. Supp. 831, 833 (S.D.N.Y.1977)). There is, however, another avenue available for exhaustion purposes. A petitioner who has failed to exhaust state remedies by pursuing a direct appeal may satisfy the exhaustion requirement by utilizing available state methods for collaterally attacking his or her state conviction. See Klein, 667 F.2d at 282 (citing Johnson v. Metz, 609 F.2d 1052, 1055-56 (2d Cir. 1979)). If collateral relief is denied, the petitioner may satisfy the exhaustion requirement by employing the state appellate procedures available for review of such denial. Id. at 283.

Generally, a state prisoner has one year from the date his or her conviction becomes final to file a habeas petition in federal court. 28 U.S.C. § 2244(d)(1). This limitations period ordinarily begins to run on "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). The limitations period is tolled while ". . . a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending . . . ." 28 U.S.C. § 2244(d)(2). After a petitioner has met these threshold requirements, a federal district court generally may hear "an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court" only if the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

**B.    Petitioner's Claims for Habeas Relief**

**1.    Admission of Davis's Testimony Regarding the Davis Robbery**

Petitioner claims that he was deprived of a fair trial when the trial court erroneously admitted Davis's testimony regarding Petitioner's alleged prior robbery of Davis. Petitioner claims the prosecution used the Davis robbery to "impart facts and inflame the jury." Am. Pet.

13

5. Petitioner argues that evidence from the Davis robbery "imprinted facts" on the Lozada case.[8] Id. Petitioner argues that unlike the Davis robbery, there was no evidence of Lozada's arms being bound to a chair or forensic blood spatter analysis indicating that Lozada was in the chair at the time of the murder.  Id.  Petitioner claims that the trial court failed to acknowledge the prejudicial effect of the "heinous prior robbery testimony" before finding the evidence admissible.  Id.

Prior to admitting Davis's testimony, the trial court set out the standard for admitting evidence of uncharged crimes:  Evidence of uncharged crimes is generally not admissible against a defendant to prove a specific crime; however, an "identity" exception exists in limited circumstances when there is clear and convincing evidence that the defendant used a distinctive modus operandi in an uncharged or charged crime as to make the evidence highly probative of the defendant's identity in the crime at issue in trial.  T1: 314-15.  The state trial court found that the probative value of the evidence concerning the Davis robbery outweighed any potential prejudice to the Defendant.  T1: 315-16.  The trial court then noted that identity was an issue at trial and the Davis robbery was highly probative of that issue.  T1: 316.  The trial court determined that the robberies were conducted with similarities:

> Both occurred during the daytime.  Both involved victims who had prior business dealings with the Defendant.  Both were perpetrated with the assistance of other individuals.  Both involved small caliber handguns.  In both instances, the victim appeared to be sitting in a chair.  In both instances, the victim had been gagged and restrained.  In both instances, it involved a victim being asked the amount of money available in a bank account.  Both instances involved a victim writing out a check payable to the Defendant.  In both instances, a call was made to a bank to

---

[8] Petitioner also argues that, in the Lozada murder case, Edna Saunders was unable to identify Petitioner's voice in the Bank of America call recording, and she was a cooperating witness for the prosecution.  Am. Pet. 5.  It is unclear how this argument supports Petitioner's contention that evidence of the Davis robbery "imprinted facts" on the Lozada murder case.  Additionally, Petitioner did not include this argument to support this claim on direct appeal.

14

confirm available funds.  In both cases, a check had been written for an even amount that was slightly less than the funds available in the account, and in both instances, it involved the Defendant giving an innocent explanation to police regarding his actions.

T1: 314-18.  Based on these similarities, the trial court granted the People's application to introduce evidence of the Davis robbery, subject to limiting instructions, to establish Petitioner's identity.  T1: 318.

On direct appeal to the Appellate Division, Petitioner argued that the introduction of the Davis testimony at trial had the effect of convicting the Defendant on "imprinted facts" not properly before the jury.  Resp't's Ex. E. 43.  Petitioner argued that the evidence of the prior robbery was "so volatile and inflammatory when amplified by the charges in this case" that any reasonable juror might convict the Defendant solely "on the basis of preventing one more similar heinous act."  Resp't's Ex. E. 44.  The Appellate Division disagreed, concluding that the trial court "correctly permitted the introduction of testimony by the victim of a robbery committed approximately six months before the murder of the victim in this case as evidence of the identity of the perpetrator of the instant crime." Saunders, 71 A.D.3d at 1058-59; Resp't's Ex. H. Petitioner included this claim in his letter application seeking leave to appeal to the Court of Appeals, which was denied by that Court.  Saunders, 15 N.Y.3d 757; Resp't's Ex. L.  Thereafter, Petitioner filed a timely petition for habeas corpus.  See 28 U.S.C. § 2244(d)(1)(A).

### i.    The Legal Standard

Petitioner's claim challenges the state court's application of state evidentiary law. Generally, state court evidentiary rulings, even if erroneous, do not present the kind of federal constitutional claims for which habeas relief may be granted.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("It is not the province of a federal habeas court to reexamine state-court

determinations on state-law questions."). In order for a state court's evidentiary ruling to present a federal constitutional claim, the ruling must have deprived the petitioner of his or her right to a fundamentally fair trial. Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985). A state court's erroneous admission of evidence results in a deprivation of this right if the evidence in question, "viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." Id. at 19.

### ii.    Application of Law to Instant Case

Petitioner's claim does not rise to the level of a federal constitutional claim. First, it does not appear that the state court's admission of this evidence was erroneous as a matter of state law, for the reasons stated by the Appellate Division:

> The testimony constituted clear and convincing evidence that the defendant committed the prior robbery by using a sufficiently distinctive and unique modus operandi similar to the manner in which the crime was committed in this case, which was probative of the defendant's identity as one of the perpetrators of the murder of the victim in this case (see People v. Mateo, 93 NY2d 327, 322 [1999]; People v. Robinson, 68 NY2d 541, 549-50 [1986]; People v. Alvino, 71 NY2d 233, 242 [1987]; People v. Molineux, 168 NY 264, 293 [1901]; People v. Smith, 63 AD3d 1301, 1303 [2009]; People v. Gousse, 57 AD3d 800 [2008]; People v. Latimer, 24 AD3d 807, 809 [2005]; People v. Manino, 306 AD2d 542 [2003]; People v. Rodriguez, 274 AD2d 593, 594[2000]).

Saunders, 71 A.D.3d at 1059; Resp't's Ex. H. The trial court also weighed the probative value of this evidence in identifying the perpetrators of Lozada's murder against any prejudice Petitioner might suffer from this evidence when determining that the evidence was admissible. T1: 315-16.

Second, even if the trial court's decision to admit Davis's testimony was a misapplication of state evidentiary law (which it was not), the trial court's ruling would still not rise to the level

of depriving Petitioner of his right to a fair trial.  Viewed in the context of the entire record, the

testimony was not "crucial, critical, highly significant" to the outcome of Petitioner's case.

Collins, 755 F.2d at 19 (quotation and citation omitted).

Evidence at trial showed that items from the Lozada crime scene were found in a garbage

bin outside of Petitioner's home.  Officer Suzanne Crane found in the garbage bin Lozada's

personal items, a pair of Petitioner's sneakers stained with Lozada's blood, and pieces of duct

tape and a pillowcase apparently used to restrain Lozada's head when he was shot.  T2: 270, 276-

77, 283-86, 443-34, 444, 514-20, 540-41, 545, 554-57, 951, 954, 957, 1009-10.  Forensic

analysis determined that the holes in the pillowcase and duct tape were bullet holes.  T2: 444,

951, 954, 957.  The blood on the duct tape was Lozada's blood.  T2: 548, 1009-10.  Forensic

analyst Ted Schwartz testified that the two black, plastic, trash bags could have come from the

opened box of Ultrasac garbage bags found in Petitioner's residence at 10 Pennyfield Avenue.

T2: 838.  The measurements, characteristics, and striation lines of the two trash bags matched

and directly lined up with the bags in the Ultrasac box.  T2: 823-829, 838.  Petitioner argued that

it was reasonable to believe that Bernardez had deposited the black garbage bags containing

Lozada's personal items and the bloody sneakers in the garbage shed, rather than Petitioner.  T2:

1209.  However, such an argument did not undermine the evidentiary value of the various

relevant items seized outside Petitioner's home.

Moreover, among the seized items were bloody sneakers belonging to Petitioner.  Edna

Saunders identified the pair of sneakers stained with Leandro Lozada's blood as sneakers which

she had given to Petitioner.  T2: 574-76.  Forensic science specialist Mary Eustace testified at

trial that the DNA of the blood stains on the sneakers matched Lozada's DNA.  T2: 999-1000.

DNA tests done on the bloody sneakers excluded Petitioner from the front portion inside both

17

sneakers, and the tests could not determine the age of the DNA inside the shoes. T2: 1069-70. However, tests done on the heel portions inside the sneakers could not exclude Petitioner and his family, though Lozada, Ramos, and Bernardez were excluded. T2: 1001, 1071-72. Thus, in addition to evidence apparently removed from the murder scene and hidden outside Petitioner's home, there was direct evidence—Petitioner's bloody sneakers—linking Petitioner to the rest of the murder evidence.

Petitioner's story about having the $57,000 check was unsubstantiated and contradicted by the evidence. Petitioner was in possession of and deposited a $57,000 check signed by Lozada and dated the same date as Lozada's murder. T2: 296-97, 371-75. No evidence was found to substantiate Petitioner's claim that Lozada planned to purchase the Lincoln Avenue vacant lot from Petitioner. T2: 749-50. Furthermore, Petitioner claimed to be selling property he did not own. T2: 749. Petitioner also could not explain what "flipping" the property meant after telling the detectives that he was "flipping" the property to Lozada. Ramos, Lozada's financial advisor, Castaldi, and Edna Saunders all testified at trial that they had no knowledge of the alleged sale. T2: 228-29, 306, 310-11, 360, 362-64, 368, 423, 583. By contrast with Petitioner's story told to the Detectives, Lozada's financial advisor testified that Lozada had, within the thirty days prior to his murder, transferred $50,000 from his bank account to his brokerage account for a higher interest rate. T2: 310-11. The advisor also testified that Lozada had had no intention of using the money any time soon. Id. Castaldi testified that Petitioner promised Castaldi the right to list the vacant lot for resale without indicating that Petitioner had found a buyer. T2: 363-64. Petitioner told Castaldi the day after Lozada's murder that the $57,000 Petitioner deposited into his account was for his own purchase of the Lincoln Avenue property.

18

Petitioner also claimed that the check was written for $57,000 because Lozada had decided on that amount. T2: 767, 891-92. However, Petitioner could not explain why Lozada had selected that particular number. T2: 891-92. The Bank of America call recording shows there was slightly over $57,000 in Lozada's account—just enough to cover the amount of the check—on the day Petitioner deposited the check, only because Lozada had transferred the maximum $50,179.49 allowed that day. T2: 326; PE: 158. Griffin testified that during Lozada's call to Bank of America, Griffin heard a second voice asking how much money was available for immediate transfer to Lozada's checking account. T2: 331. Detective Piedade testified that the second voice in Lozada's call to Bank of America sounded like Petitioner's voice. T2: 788.

DNA testing of wall markings in Lozada's home matched the DNA of Bernardez, and Petitioner had been calling Bernardez's home telephone and mobile phone numbers the night before and the morning of Lozada's murder. T2: 780-81, 859-62, 1078, 1095-97. The bullet fragments retrieved from Lozada's head were .22 caliber, hollow point, and copper coated, and had on them the same manufacturing marks and substance as .22-caliber shell casings found in Lozada's home. T: 1333-34, 1157-58. Detectives recovered from Bernardez's home a box of .22-caliber cartridges of the same type and classification as the bullet fragments retrieved from Lozada's head. T2: 622, 625, 629, 1134-36, 1138. All of this evidence, even without the evidence of the Davis robbery, was more than sufficient to establish Petitioner's participation in the murder of Lozada.

At trial, the People also offered evidence of Petitioner's motive to commit the crimes for which he was convicted. Petitioner had already lost $47,000 in a prior property that he had sought to purchase. T2: 352-53. Petitioner was facing the possibility of losing another $10,000 if he failed to pay the rest of his down payment for the Lincoln Avenue property. T2: 360.

19

Petitioner had also promised Edna Saunders that they were going to move to the Lincoln Avenue property in the first week of January. T2: 567, 576-77, 580. The evidence of Petitioner's motive provided even greater proof of Petitioner's guilt.

In light of this evidence, while the Davis robbery statements offered at trial helped prove the issue of identity, they were not "sufficiently material to provide the basis for conviction." Thus, I conclude, and respectfully recommend that Your Honor should conclude, that this claim should be denied.

### 2.    Violation of the Right to Silence

Petitioner contests the voluntariness of the statements that he made after he was given Miranda warnings. Am. Pet. 7. Petitioner claims that the detectives questioned Petitioner "continuously" until Petitioner was taken to the hospital for his diabetic condition. Id. Upon Petitioner's release from the hospital, the detectives continued to elicit involuntary statements from Petitioner. Id.

The trial court denied Petitioner's motion to suppress statements made to the detectives while Petitioner was in custody. H: 421-22. The trial court determined that Petitioner knowingly, voluntarily, and intelligently waived his Miranda rights. H: 420-21. The trial court based its ruling on its finding that Petitioner was advised of his Miranda rights for the first time upon his arrest for grand larceny. H: 418. Within an hour of Petitioner's arrest, Petitioner was advised for a second time of his Miranda rights, when he arrived at the Yonkers Police Department. H: 418-19. Petitioner then made certain admissions regarding financial transactions with Lozada. H: 419. The detectives stopped questioning Petitioner when Petitioner said he did not want to speak any more. Id. The trial court found that Petitioner did not invoke any of his Miranda rights and that Petitioner only indicated a desire to stop talking,

20

which the detectives honored. Id. Petitioner was then taken to the hospital, and upon his return the detectives again advised Petitioner of his Miranda rights and asked if Petitioner would speak to them. Id. Petitioner acknowledged his rights and agreed to speak. Id. Defendant made certain statements about items of evidence found in the trash near his home. H: 420. Petitioner did not then communicate the desire to cease being questioned. H: 419-20. The trial court found there was no evidence that Petitioner had been threatened in any manner or subjected to any undue pressure or police misconduct. H: 420. Having found that the People met their burden of establishing beyond a reasonable doubt that Petitioner's statements were voluntarily and knowingly made, the trial court denied Petitioner's motion to suppress the statements made to the detectives. H: 421-22.

On appeal, Petitioner argued that he was denied a fair trial by admission of statements that Petitioner made involuntarily. Resp't's Ex. E. 49. Petitioner argued that the detectives designed the interrogation to evoke a confession from Petitioner. Id. Petitioner also claimed that it was in an "atmosphere of pressure and duress" that Petitioner agreed to talk about the $57,000 check with the detectives. Id. Petitioner argued that his refusal to sign the waiver card constituted an invocation of his right to remain silent. Id. at 50. Petitioner argued that a fresh set of Miranda warnings given to Petitioner after his return from the hospital had "no meaning" and that there was a "single continuous interrogation." Id. at 51. The People conceded that Petitioner was questioned by Sergeant Rinaldi without new Miranda warnings before going to the hospital but that it was harmless error to admit Petitioner's statements made during that time to Rinaldi. Resp't's Ex. F. 49-50, 55. The Appellate Division affirmed the trial court's ruling and agreed with the People's argument that failure to deny the suppression of Petitioner's statements to Rinaldi was harmless error:

> The erroneous admission of the defendant's statement to the Detective Sergeant was harmless, as the proof of the defendant's guilt, without reference to the error, was overwhelming, there was no significant probability that the jury would have acquitted the defendant had it not been for the admission of the statement, and a portion of the statement was cumulative to the other statements the defendants made to detectives.

Saunders, 71 A.D.3d at 1060; Resp't's Ex. H. 2.  Petitioner included this claim in his application for leave to appeal the Appellate Division's decision.  Resp't's Ex. I.  The application was denied. Saunders, 15 N.Y.3d 757 (2010); Resp't's Exhibit L.  Having "fairly presented" this claim in state court, Petitioner has exhausted this claim.  See Daye, 696 F.2d at 192, 194; Klein, 667 F.2d at 282.

### i.      The Legal Standard

"[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent."  Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).  In other words, "the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Id. (footnotes omitted).  "[A]ll criminal defendants must be apprised of certain rights before a custodial interrogation may begin, including . . . the right to remain silent and be afforded the assistance of counsel."  United States v. Plugh, 648 F.3d 118, 125 (2d Cir. 2011), cert. denied, 132 S. Ct. 1610 (2012).  The defendant can make two legally distinct choices: "(1) unambiguously invoke those rights and thereby cut off further questioning or (2) knowingly and voluntarily waive those rights and cooperate fully."  Id.

An invocation of the right to remain silent must be unambiguous.  Berghuis v. Thompkins, 560 U.S. 370, 381 (2010); Plugh, 648 F.3d at 124.  The refusal to sign a waiver card

does not necessarily constitute an invocation of the right to remain silent, particularly when the refusal is accompanied by statements indicating ambivalence or uncertainty.  Plugh, 648 F.3d at 125.  "Once an accused in custody unequivocally invokes the right to remain silent, interrogation must ordinarily cease."  Campaneria v. Reid, 891 F.2d 1014, 1021 (2d Cir. 1989), cert. denied, 111 S. Ct. 1419 (1991).  This rule is not a per se prohibition against all further interrogation.  Id. (citing Michigan v. Mosley, 423 U.S. 96, 104-07 (1975)).  "Questioning can be resumed after fresh Miranda warnings are given and the right to remain silent is otherwise scrupulously honored."  Id.  Whether a defendant's invocation of the right to silence was "scrupulously honored" depends on factors such as the length of time between questioning and questioning on a different subject matter than the original interrogation.  Id.  These factors are not exhaustive or dispositive.  See Wilson v. Henderson, 584 F.2d 1185, 1188 (2d. Cir. 1978) ("We are not of the belief, however, that the crucial factor in determining a Fifth Amendment violation should be the length of time between questioning."); Brown v. Caspari, 186 F.3d 1011,1015 (8th Cir. 1999) ("[A] second interrogation is not rendered unconstitutional simply because it involves the same subject matter discussed during the first interview.");[9] United States v. Suarez, 2006 WL 3543616, at *6 (S.D.N.Y. Dec. 7, 2006) ("The factors set out by the Court in Mosley are not a strict test for admissibility."); United States v. Dell'Aria, 811 F. Supp. 837, 843 (E.D.N.Y. 1993) ("[T]he Mosley Court did not intend these factors to be exhaustive . . . .  [T]he central focus of

---

[9] The Second Circuit has not ruled on whether a second interrogation is rendered unconstitutional merely because it involved the same subject matter as the first interrogation. However, other circuits have held that questioning on the same subject matter is not by itself unconstitutional. See United States v. Wyatt, 179 F3d 532, 538 (7th Cir. 1999) ("[T]he constitutionality of a subsequent police interview depends not on its subject matter, but rather on whether the police . . . sought to undermine the suspect's resolve to remain silent."); Weeks v. Angelone, 176 F.3d 249, 267-69 (4th Cir. 1999) ("[T]he mere fact that a second interrogation involves the same crime as the first interrogation does not necessarily render a confession derived from the second interrogation constitutionally invalid under Mosley.").

the determination is the conduct of law enforcement authorities.").

The defendant may also waive his or her Miranda rights, provided that the waiver is made "voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444. The waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and it must be "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). The prosecution does not need to show that a waiver of Miranda rights was express. Berghuis, 560 U.S. at 384. A written waiver is not required. North Carolina v. Butler, 441 U.S. 369, 373 (1979); United States v. Boston, 508 F.2d 1171, 1175 (2d Cir. 1974); United States v. Santiago, 174 F. Supp. 2d 16, 25 (S.D.N.Y. 2001) (collecting cases). An implicit waiver of the right to remain silent is sufficient to admit a suspect's statement into evidence." Berghuis, 560 U.S. at 384. "Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Id.

"Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived." Moran, 475 U.S. at 421 (citations omitted). The Second Circuit has summarized three sets of circumstances a court should consider in applying the totality of the circumstances test: "(1) the characteristics of the accused; (2) the conditions of interrogation, and (3) the conduct of law enforcement officials." Green v. Scully, 850 F.2d 894, 901-02 (2d Cir. 1988). The relevant characteristics of the accused are the individual's experience and background, along with the individual's youth and lack of education or intelligence. Id. at 902. The conditions under which a suspect is questioned include the place where an

24

interrogation is held and the length of detention. Id. Facts bearing on law enforcement officers'
conduct include: "the repeated and prolonged nature of the questioning or the failure to inform
the accused of his constitutional rights; whether there was physical mistreatment such as
beatings . . . or long restraint in handcuffs[;] and whether other physical deprivations occurred
such as depriving an accused of food, water or sleep . . . ." Id. (citations omitted).

"[T]he ultimate question whether, under the totality of the circumstances, the challenged
confession was obtained in a manner compatible with the requirements of the Constitution is a
matter for independent federal determination." Miller v. Fenton, 474 U.S. 104, 112 (1985).
Thus, federal courts are "not bound by" a state court's finding regarding the voluntariness of a
confession and are required to "make an independent evaluation of the record." Id. at 110
(quoting Mincey v. Arizona, 437 U.S. 385, 398 (1978)). This requirement for independent
review specifically extends to federal courts considering petitions for writs of habeas corpus. Id.
at 111 (citing Davis v. North Carolina, 384 U.S. 737, 741-42 (1966)). However, a state court's
determinations of "subsidiary factual questions," such as "whether a drug has the properties of a
truth serum or whether in fact the police engaged in the intimidation tactics alleged by the
defendant," are entitled to the presumption of correctness provided by AEDPA. Id. at 112; see
also Green, 850 F.2d at 900 ("The statutory [AEDPA] presumption refers to historical facts, that
is, recitals of external events and the credibility of the witnesses narrating them.").

    ii.       **Application of Law to Instant Case**

In Petitioner's case, the issue of the voluntariness of both Petitioner's waiver of his
Miranda rights and his subsequent statements to the police was fully developed during the
Huntley hearing. See H: 5-431. The totality of the circumstances as established by the record
supports the conclusion that Petitioner made his statements to the detectives after he voluntarily,

25

knowingly, and intelligently waived his <u>Miranda</u> rights.

Petitioner argues that he first invoked his right to silence by refusing to sign the card when given <u>Miranda</u> warnings at the Yonkers Police Station on January 5, 2007. However, the refusal to sign a waiver card does not necessarily constitute an "unambiguous" invocation of the right to silence. <u>See Plugh</u>, 648 F.3d at 125. Contrary to clearly indicating the desire to cease questioning, Petitioner voluntarily made statements about the $57,000 check to the detectives after acknowledging he understood his <u>Miranda</u> rights. H: 33, 37-40. In doing so, Petitioner waived his right to silence. <u>See Berghuis</u>, 560 U.S. at 384. The detectives were not required to obtain a written waiver from Petitioner to demonstrate that the waiver was voluntary. <u>See Butler</u>, 441 U.S. at 373; <u>Boston</u>, 508 F.2d at 1175; <u>Santiago</u>, 174 F. Supp. 2d at 25.

Petitioner also argues that the statements were coerced because he was questioned continuously after he refused to sign the waiver card. Am. Pet. 7. An application of the <u>Green</u> factors in this instant case shows that Petitioner's statements were made voluntarily. First, Petitioner is legally an adult and there was no evidence in the record indicating that Petitioner lacked intelligence to understand the <u>Miranda</u> rights read to him. <u>See Diaz v. Senkowski</u>, 76 F.3d 61, 65 (2d Cir. 1996) (finding knowing and voluntary waiver where petitioner was legally an adult and there was no evidence that petitioner had below-average intelligence). In fact, Petitioner knew to invoke his right to silence later in the interrogation when Detective Piedade pointed out that Petitioner could not have known about Lozada's death at the time Petitioner deposited the check. H: 40-41. Though Petitioner is a diabetic, he did not appear to be sick or in pain. H: 43. Petitioner's medical records from Saint Joseph's Hospital showed that Petitioner slept for a significant portion of the time that he was at the hospital and the medical staff determined his physical condition did not require his admission to the hospital. H: 418. Thus,

the fact that Petitioner was a diabetic and was sent to the hospital did not render the detectives' questioning of the Petitioner at the police station coercive, especially when Petitioner did not appear to be in discomfort. Compare Campaneria, 891 F.2d at 1020 (finding that law enforcement officers' questioning of defendant at the hospital when defendant was awake and alert despite being in pain was not coercive), with Mincey, 437 U.S. at 396, 398-99 (finding that defendant's statements were coerced where defendant was interrogated while he was in great pain in the intensive care unit and "encumbered by tubes, needles, and breathing apparatus").

Second, the conditions of the interrogation did not create a coercive atmosphere. Petitioner was placed in a standard interview room and was questioned for approximately an hour. H: 31-33, 41. Courts have found that similar interrogation conditions were not coercive. See, e.g., Berghuis, 560 U.S. at 387-88 (finding that an interrogation in a standard-sized room and lasting three hours was not coercive); Green, 850 F.2d at 902 (finding that an interrogation in a hearing room lasting just over two hours was not coercive); United States v. DiLorenzo, 1995 WL 366377, at *3-4 (S.D.N.Y. June 19, 1995) (finding that an interrogation in an office of average size and lasting two and a half hours was not coercive).

Third, there was no evidence of officer misconduct. There was no evidence that the detectives physically threatened or beat the Petitioner. Further, the detectives did not have their weapons with them in the interview room. H: 37-38. Petitioner was not restrained with handcuffs and was allowed to use the restroom when requested. H: 31, 37, 42. The detectives ceased questioning when Petitioner said he did not want to talk anymore. H: 40. The door was left ajar when Detectives Piedade and Chiarella left the room. H: 42. The detectives' conduct supports the state trial court's finding that Petitioner's statements were voluntary. Compare Berghuis, 560 U.S. at 386-87 (finding no coercion where defendant was not threatened or injured

by police); <u>Plugh</u>, 648 F.3d at 128 (finding voluntary waiver where there was no evidence that defendant was threatened physically or psychologically abused in any manner); <u>Diaz</u>, 76 F.3d at 65 (finding voluntary waiver where defendant was not beaten, abused, handcuffed, or denied food, access to the bathroom, or sleep during his interrogation), <u>with</u> <u>Mincey</u>, 437 U.S. at 396, 398-99 (finding involuntary waiver where police questioned petitioner "relentlessly" while petitioner was seriously wounded, on the "edge of consciousness" in the intensive care unit, and had expressed his wish not to be interrogated); <u>Greenwald v. Wisconsin</u>, 390 U.S. 519, 520-21 (1968) (finding involuntary confession where petitioner was deprived of food, sleep, and medication, denied counsel, and received inadequate warnings about constitutional rights); <u>United States v. Guzman</u>, 724 F. Supp. 2d 434, 446-47 (S.D.N.Y. 2010) (finding involuntary confession where officer did not observe defendant's invocation of right to silence).

Statements that Petitioner made to Sergeant Rinaldi during the second interrogation of Petitioner should have been suppressed.  "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under <u>Miranda</u> on whether his 'right to cut off questioning' was 'scrupulously honored.'" <u>Mosley</u>, 423 U.S. at 104.  Here, Rinaldi began asking Petitioner questions about the same subject matter soon after Petitioner indicated he no longer wanted to speak to the detectives about the $57,000 check.  H: 41-42, 230.[10]  Rinaldi also did not re-advise Petitioner of his <u>Miranda</u> rights prior to beginning the interrogation.  H: 237, 239-40.  The short length of time between the first and second interrogations and the questioning on the same subject matter supports a finding that Rinaldi failed to scrupulously honor the Petitioner's right to cut off questioning.  <u>See</u> <u>Campaneria</u>, 891 F.2d at 1021 (noting length of

_____

[10] Rinaldi was not aware that Petitioner had stated earlier he no longer wished to speak with the detectives.  T2: 906.

time between questioning and similarity between subject matter of the interrogations as factors that are indicative of whether the right to cut off questioning was scrupulously honored); Guzman, 724 F. Supp. 2d at 446-47.

Petitioner did, however, voluntarily waive his right to silence during the third interview when he returned from the hospital and made uncoerced statements. When Petitioner was brought back to the interview room from the hospital, Detective Piedade re-advised Petitioner of his Miranda rights. H: 49. Petitioner argued on appeal to the Appellate Division that "[u]nder these circumstances" a "fresh set of Miranda warnings have no meaning." Resp't's Ex. E. 51. However, the record indicates that Petitioner replied to Detective Piedade, "I know my rights." H: 49. There is no evidence in the record that Petitioner was ill or incapable of understanding his rights, and this was the third time Petitioner had been advised of his Miranda rights. The fact that Petitioner still refused to sign the card is of no moment, especially when Petitioner said without being coerced that he wished to speak with the officers. H: 50. See United States v. Boston, 508 F.2d 1171, 1175 (1974); see also Suarez, 2006 WL 3543616, at *6 (finding that defendant's rights were not violated where defendant made an inculpatory statement upon being presented with the results of a search of his car despite initially determining not to speak with the officers). In Boston, the defendant refused to sign a waiver of his Miranda rights. Boston, 508 F.2d at 1175. However, when officers subsequently relayed to the defendant information about evidence found in his apartment, the defendant admitted his participation in the robbery. Id. The Second Circuit found that the defendant had made a voluntary waiver of his right to remain silent. Id. Here, Petitioner engaged the detectives in conversation, asking the detectives what they had found in the garbage shed, upon being confronted with the news that law enforcement officers found items in the garbage bin outside Petitioner's home. H: 50, 52. By making

29

uncoerced statements to the detectives after acknowledging his <u>Miranda</u> rights, Petitioner

knowingly and voluntarily waived his right to silence.  <u>See</u> <u>Boston</u>, 508 F.2d at 1175; <u>Suarez</u>,

2006 WL 3543616, at *6.

Just as was the case in the first interrogation, there was no evidence of police misconduct

during the third interrogation.  Petitioner was not handcuffed during the interview.  H: 48, 176.

There were no weapons in view.  H: 49.  No one made threats or promises to Petitioner.  H: 59.

Petitioner received coffee and food when requested.  H: 47, 52.  Petitioner remained

unhandcuffed after Detective Piedade left the room.  H: 61.  The interrogation lasted for

approximately an hour, with a three-hour break, and then resumed for approximately fifteen

minutes.  H: 58, 64, 178.

Furthermore, the detectives did not violate Petitioner's right to silence by resuming

interrogation upon Petitioner's return from the hospital.  Petitioner was re-advised of his <u>Miranda</u>

rights.  Approximately six and one-half hours had passed from the time the detectives had ceased

questioning Petitioner the day before.  H: 45-46, 225.  The detectives began the discussion on a

different subject matter, involving the evidence found in the garbage bin outside Petitioner's

apartment.  H: 50.  These factors support a finding that Petitioner's invocation of his right to

silence the day before had been "scrupulously honored."  <u>See</u> <u>Campaneria</u>, 891 F.2d at 1021.

Even if the subject matter reverted back to the issue of the $57,000 check, questioning on the

same subject matter does not necessarily render a second interrogation unlawful.  <u>See</u> <u>Caspari</u>,

186 F.3d at 1015; <u>Wyatt</u>, 179 F3d at 538; <u>Weeks</u>, 176 F.3d at 267-69.  There is no indication in

the record that the conduct of the detectives was coercive or that Petitioner did not wish to speak

to the detectives.

Although Petitioner's statements from the second interrogation were admitted in error at

trial, it was harmless error.  In assessing whether to overturn a state conviction, the federal court must apply the Brecht[11] standard and assess whether the constitutional violation had a "substantial and injurious effect" in determining the jury's verdict.  Wood v. Ercole, 644 F.3d 83, 93-94 (2d Cir. 2011) (citing Frye v. Pliler, 551 U.S. 112, 121-22 (2007)).  Here, the statements Petitioner made to Sergeant Rinaldi were in large part the same as the responses Petitioner made during the first and third interrogations, which were lawfully admitted at trial.  During the second interrogation Petitioner said he did not know how Lozada arrived at the $57,000 figure for the check and that the check was post-dated so that Lozada could liquidate some assets.  H: 232-33.  Petitioner was unable to explain what "flipping" the property meant.  H: 233.  During the first interrogation, Petitioner said Lozada chose the $57,000 amount and post-dated the check for tax reasons.  H: 38-39; T2: 750-51.  Petitioner was unable to explain what he meant by "flipping" the property.  Id.  During the third interrogation, Petitioner repeated that Lozada chose the amount for the check.  H: 52.  Because the statements from the first and third interrogations were properly admitted at trial and were in substantial part the same as the statements made during the second interview, the erroneously admitted statements from the second interrogation could not have had a "substantial and injurious effect" in determining the jury's verdict.

Accordingly, based upon an independent evaluation of the record, I respectfully recommend that Your Honor should conclude that Petitioner voluntarily waived his Miranda rights, his statements from the first and third interrogations were properly admitted, and the admission of his statements from the second interrogation was harmless error.  Therefore, this claim does not provide a basis for habeas relief.

### 3.   Weight of the Evidence

---

[11] Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

Petitioner's third claim for habeas relief is that the jury's verdict was against the weight of the evidence. Am. Pet. 8. Petitioner argues that he was "primarily convicted of this murder by way of testimony concerning his alleged prior robbery six months prior to the murder." Id. On appeal to the Appellate Division, Petitioner argued that without evidence of the prior robbery, the only evidence linking Petitioner to the crime scene were the bloody sneakers and the Bank of America call recording. Resp't's Ex. E. 53. Petitioner argued that Edna Saunders did not recall seeing the sneakers after she and Petitioner sold their prior house. Id. In addition, Petitioner argued an allele 10 in the sneakers did not belong to Petitioner or his family, which demonstrates there was someone else's DNA in the shoes. Id. at 53-54. With regard to the Bank of America call recording, Petitioner argued that it was unreliable because Edna Saunders did not recognize the Defendant's voice in the recording and there was not enough of a recording for the Federal Bureau of Investigation to conduct an analysis of it. Id. at 54. Thus, Petitioner argued that, without the evidence of the prior robbery, the jury was not justified in finding Petitioner guilty beyond a reasonable doubt. Id. This claim was included in Petitioner's application for leave to appeal the Appellate Division's decision, which was denied by the Court of Appeals. Resp't's Ex. I.

### i.    The Legal Standard

It is well-settled that weight-of-the-evidence claims are purely state law claims and are not cognizable on habeas review. See Klosin v. Conway, 501 F. Supp. 2d 429, 439 n.2 (W.D.N.Y. 2007) (collecting cases). As summarized in Garrett v. Perlman, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006):

> Unlike a sufficiency of the evidence claim, which is based upon federal due process principles, a weight of the evidence claim is "an error of state law, for which habeas review is not available." Douglas v. Portuondo, 232 F. Supp. 2d

106, 116 (S.D.N.Y. 2002). "A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5)" which empowers New York State intermediate appellate court to make weight of the evidence determinations. Correa v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001). In making a "weight of the evidence" argument, Petitioner has not asserted a federal claim as required by 28 U.S.C. § 2254(a). Instead, he has raised an error of state law, for which habeas review is not available. See Lewis v. Jeffers, 497 U.S. 764, 780, 110 S. Ct. 3092, 111 L.Ed.2d 606 (1990) (habeas corpus review not available to remedy alleged error of state law).

To make out a sufficiency of the evidence claim, Petitioner must show that the Appellate Division's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1). A decision can be "contrary to" the precedent established by the Supreme Court in two ways: first, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court]," or, second, "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court's]." Williams v. Taylor, 529 U.S. 362, 405 (2000). A state court decision can involve an "unreasonable application" of the Supreme Court precedent when the state court either "identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts" of the case, or "unreasonably extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407.

A challenge to the sufficiency of the evidence must be rejected if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). When considering the sufficiency of the evidence of a state conviction "[a] federal court must look to state law to determine the elements of the crime." Ponnapula v.

Spitzer, 297 F.3d 172, 179 (2d Cir. 2002) (quoting Quartararo v. Hanslmaier, 186 F.3d 91, 97

(2d Cir.1999)).  A petitioner "bears a very heavy burden in convincing a federal habeas court to

grant a petition on the grounds of insufficiency of the evidence."  Fama v. Comm'r of Corr.

Servs., 235 F.3d 804, 811 (2d Cir. 2000) (citation omitted).

     **ii.**    **Application of Law to Instant Case**

Petitioner's weight of the evidence claim is not cognizable for habeas corpus review.  See

28 U.S.C. § 2254(a); Ex parte Craig, 282 F. 138, 148 (2d Cir. 1922), aff'd, 263 U.S. 255 (1923);

Garrett, 438 F. Supp. 2d at 470.  Even if the petition is construed to allege a sufficiency of the

evidence claim, Petitioner still would not be entitled to habeas relief.  In this case, a jury found

Petitioner guilty on (1) four counts of murder in the second degree; (2) one count of kidnapping

in the first degree, (3) one count of robbery in the first degree, (4) one count of burglary in the

first degree, and (5) one count of criminal possession of a weapon in the second degree.

Viewing the evidence in the light most favorable to the prosecution, there is sufficient evidence

from which a rational trier of fact could find, beyond a reasonable doubt, the elements of the

felonies for which Petitioner was convicted.

Pursuant to N.Y. Penal Law § 125.25(1), "A person is guilty of murder in the second

degree when . . . [w]ith intent to cause the death of another person, he causes the death of such

person or of a third person."

"A person is guilty of kidnapping in the first degree when he abducts another person and

when . . . [t]he person abducted dies during the abduction or before he is able to return or to be

returned to safety."  N.Y. Penal Law § 135.25(3).  "Abduct" means to "restrain a person with

intent to prevent his liberation by either (a) secreting or holding him in a place where he is not

likely to be found, or (b) using or threatening to use deadly physical force."  N.Y. Penal Law §

135.00(2).  "Restrain" means to "restrict a person's movements intentionally and unlawfully in such manner as to interfere substantially with his liberty by moving him from one place to another, or by confining him either in the place where the restriction commences or in a place to which he has been moved, without consent and with knowledge that the restriction is unlawful." N.Y. Penal Law § 135.00(1).

"A person is guilty of robbery in the first degree when he forcibly steals property and when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . [i]s armed with a deadly weapon."  N.Y. Penal Law § 160.15(2).

"A person is guilty of burglary in the first degree when he knowingly enters or remains unlawfully in a dwelling with intent to commit a crime therein, and when, in effecting entry or while in the dwelling or in immediate flight therefrom, he or another participant in the crime . . . [i]s armed with explosives or a deadly weapon."  N.Y. Penal Law § 140.30(1).

"A person is guilty of murder in the second degree when . . . [a]cting either alone or with one or more other persons, he commits or attempts to commit robbery, burglary, [or] kidnapping . . . and, in the course of and in furtherance of such crime or of immediate flight therefrom, he, or another participant, if there be any, causes the death of a person other than one of the participants . . . ."  N.Y. Penal Law § 125.25(3).

"A person is guilty of criminal possession of a weapon in the second degree when . . . with intent to use the same unlawfully against another, such person . . . possesses a loaded firearm."  N.Y. Penal Law § 265.03(3).

Evidence at trial included the following details.  Lozada was restrained with duct tape and a pillowcase around his head while seated in a chair.  T2: 479-80, 542, 954-58, 995-96.  A

35

yellow chair was brought from Lozada's living room to the bedroom.  T2: 479-80, 995-96.  The

pattern of blood on the yellow chair and the bullet wounds in Lozada's head indicated that

Lozada was seated when he was shot.  T2:  479-80, 995-96, 1151-52.  Lozada was shot in the

face and head with a gun and died as a result of the bullet wounds.  T2: 1148-49, 1157.

Lozada's personal items were found in the garbage bin outside Petitioner's house, along

with bloody sneakers and other items stained with Lozada's blood, as discussed supra.  Petitioner

denied that he had ever seen the sneakers.  T2: 773.  However, Edna Saunders testified that those

sneakers belonged to Petitioner and DNA analysis of portions inside the sneakers could not

exclude Petitioner.  T2: 574-76, 1000-01, 1071-72.  Petitioner suggested that Bernardez

deposited the evidence in the garbage bin outside Petitioner's home, but such an argument does

not undermine the evidence supporting a finding that Petitioner actively conspired with

Bernardez to commit the murder.  Bernardez's DNA profile was excluded from the DNA

collected inside the bloody sneakers, and the only logical conclusion from the evidence was that

Petitioner had worn the sneakers during the murder.  T2: 1072.  Forensic analysis of the black

plastic garbage bags containing the items from the crime scene demonstrated that the bags were

very likely from the opened box of black garbage bags underneath Petitioner's sink.  T2: 823-29,

838.  Petitioner claimed Edna Saunders bought the box of garbage bags, but Edna Saunders

refuted this claim. T2: 579-80, 774.  The night before and on the date of the murder Petitioner

had called the cell phone number and home number of Bernardez, whose DNA profile matched

the wall markings in Lozada's home.  T2: 780, 859-62, 1078, 1095-97.  Detectives recovered

from Bernardez's home a box of .22-caliber cartridges of the same type and classification as the

bullet fragments retrieved from Lozada's head.  T2: 622, 625, 629, 1134-36, 1138.  The evidence

of Petitioner's participation in the Davis robbery further proves Petitioner's identity in

perpetrating the very similar crimes against Lozada. T2: 635-60.

Petitioner's story about the $57,000 check was uncorroborated by any other evidence in the record and was inconsistent with testimony from Lozada's investment advisor and Petitioner's realtor Castaldi. T2: 310-11, 356-58. Detective Piedade identified Petitioner's voice on the Bank of America call recording. T2: 788. Petitioner did not own the property he claimed to be selling to Lozada, and there were no records found of any communications, negotiations, or documents related to this alleged real estate sale. T2: 749-50.

Furthermore, the People presented evidence of Petitioner's motive to commit the crimes for which he was convicted. Petitioner had the financial need for the down payment on the Lincoln Avenue property and would have lost his $10,000 deposit had he not paid his down payment. T2: 360. He had already previously lost $47,000 on a prior failed real estate transaction, and he had already promised Edna Saunders that they would be moving into the Lincoln Avenue property in the beginning of 2007. T2: 352-53, 567, 576-77, 580. Castaldi testified that Petitioner said the $57,000 check was for Petitioner's own down payment. T2: 356-58.

Although Petitioner points out certain weaknesses in the People's evidence—such as Edna Saunders testifying she was not sure the third voice on the recording of the Bank of America call was Petitioner's[12]—the standard of review requires the evidence to be viewed "in the light most favorable to the prosecution." See Jackson, 443 U.S. at 319. Contrary to Petitioner's claim that he was primarily convicted based on evidence of the Davis robbery, the People presented sufficient evidence, in addition to the Davis robbery, to establish Petitioner's participation in Lozada's murder. Given the evidence discussed above, Petitioner has not met his

---

[12] T2: 584.

"heavy burden" to show that no rational trier of fact could find beyond a reasonable doubt the elements of the crimes for which he was convicted.  Therefore, I conclude, and respectfully recommend that Your Honor should conclude, that this claim should be denied.

**III.**   **CONCLUSION**

For the foregoing reasons, I conclude, and respectfully recommend that Your Honor should conclude, that the instant petition be dismissed.

**IV.**   **NOTICE**

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) working days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation.  Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Cathy Seibel at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Seibel.

Dated: May 16, 2014
       White Plains, New York

Respectfully submitted,

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York

38

A copy of the foregoing Report and Recommendation has been sent to the following:

The Honorable Cathy Seibel, U.S.D.J.

Samuel Saunders
08-A-1766
Fishkill Correctional Facility
271 Matteawan Road, P.O. Box 1245
Beacon, New York 12508-0307

John Collins
Office of the District Attorney of Westchester County
111 Dr. Martin Luther King Jr. Blvd.
White Plains, New York 10601